1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Glamour Dolls Incorporated,                    No. CV-21-00228-TUC-SHR

10                  Plaintiff,                    **Order Re: Defendants' Motion to Dismiss First Amended Complaint**

11  v.

12  Lisa Frank Incorporated, et al.,

13                  Defendants.

14

15        Pending before the Court is Defendants Lisa Frank and Lisa Frank, Inc.'s ("LFI")

16  Motion to Dismiss First Amended Complaint ("Motion").  (Doc. 31.)  Defendants filed

17  their Motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiff

18  Glamour Dolls Inc. filed a Response (Doc. 34).  For the reasons stated below, the Court

19  grants in-part and denies in-part Defendants' Motion.[1]

20        **I. Background**

21        The following facts from the First Amended Complaint ("FAC") (Doc. 28) are

22  construed in the light most favorable to Plaintiff.  Plaintiff is a New Jersey vegan cosmetics

23  company and LFI is an Arizona artwork company.  (Doc. 28 ¶¶ 1-2, 6.)  In June 2016,

24

25        [1] Although both parties requested oral argument (Doc. 31 at 1; Doc. 34 at 1), the

26  Court declines because oral argument will not aid in resolution of the issues raised.  *See* LRCiv 7.2(f) ("The Court may decide motions without oral argument."); Fed. R. Civ. P. 78; *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) ("[A] district court can

27  decide the issue without oral argument if the parties can submit their papers to the court."); *see also Bach v. Teton Cty. Idaho*, 207 F. App'x 766, 769 (9th Cir. 2006) ("Due

28  process does not require the district court to hold oral argument before ruling on pending motions.")

Plaintiff and Defendants collaborated and entered into a license agreement (the "2016 Agreement") granting Plaintiff a license to use and sell "cosmetic products branded with LFI's Artwork and/or Trademarks" ("Licensed Products") until December 31, 2017, in exchange for, among other things, guaranteed minimum royalty payments.[2]  (*Id.* ¶¶ 9-10.) Around June 2017, Plaintiff submitted samples to Defendants related to a Kickstarter campaign.[3]  (*Id.* ¶¶ 32-33, 35.)  Plaintiff alleges Defendants failed to timely review those samples and provide artwork for that campaign, thereby causing Plaintiff to fall behind schedule.  (*Id.* ¶¶ 32-35.)  According to Plaintiff, despite its best efforts to produce, market, and sell Licensed Products, Defendants "continuously breached the 2016 Agreement and actively, intentionally hindered [Plaintiff's] efforts to fulfill its contractual obligations." (*Id.* ¶¶ 19-20, 22.)  Plaintiff alleges Defendants did so "to prevent [Plaintiff] from enjoying the . . . contractual benefits to which [D]efendants had already availed themselves."  (*Id.* ¶ 31.)

Around December 2017, Defendants threatened to cease production "on all outstanding products, including discussions and review, feedback, and approval on already submitted samples, unless and until [Plaintiff] signed another License Agreement" (the "2017 Agreement") and "tendered the first guaranteed-minimum royalty payment for such in advance."  (Doc. 28 ¶ 37.)  Plaintiff signed the 2017 Agreement but claims it did so "under extreme duress."[4]  (*Id.* ¶ 28.)  The 2017 Agreement increased the guaranteed minimum royalty payment from $100,000 to $500,000 and required quarterly payments rather than a lump sum at the end of the contract.  (*Id.* ¶ 40.)  Under both agreements, Plaintiff agreed to adhere to multiple stages of scrutiny before distribution of Licensed Products and to pay Defendants a guaranteed minimum royalty payment and portion of

---

[2]The 2016 Agreement is attached to Defendant's motion to dismiss Plaintiff's initial complaint, docketed at item 12-1.

[3]Kickstarter is an online platform where "creators share new visions for creative work with the communities that will come together to fund them."  Kickstarter, https://www.kickstarter.com/about (last visited Aug. 3, 2022).  This platform is often used to raise money for the development of new products.

[4]The 2017 Agreement is attached to Defendant's motion to dismiss Plaintiff's initial complaint, docketed at item 12-2.

sales.  (*Id.* ¶¶ 10, 15-16, 40; *Compare* Doc. 12-1 at 2-3, 5,7 *with* Doc. 12-2 at 2-3, 5-8.)[5]

Despite the 2017 Agreement, Plaintiff alleges Defendants "continued to act in extraordinarily bad faith and breach the provisions of the 2017 . . . Agreement."  (Doc. 28 ¶ 41.)  By May 2018, Defendants had only approved four out of fourteen Kickstarter products for distribution.  (*Id.* ¶ 50.)  That same month, Plaintiff met with Janice Ross—LFI's Vice President—to discuss production for the Kickstarter campaign.  (*Id.* ¶ 51.) During that meeting, Plaintiff expressed frustrations with the collaboration and Ross "made a commitment to help facilitate the production and distribution of all Kickstarter campaign products by June 2018."  (*Id.* ¶¶ 51-52.)

Around June 15, 2018, Defendants demanded Plaintiff pay the third $125,000 guaranteed minimum payment, which was originally due on June 24, 2018.  (Doc. 28 ¶ 56.) Defendants "refused to provide artwork, accept samples for review, or engage in any communication with" Plaintiff until such payment was made.  (*Id.* ¶ 57.)  Plaintiff alleges it "was forced" to make the payment because it "had devoted all of its financial resources" into this collaboration and needed Defendants' cooperation and authorization to fulfill its obligations to customers and Kickstarter backers.  (*Id.* ¶ 58.)  Upon receipt of such payment, Defendants "ordered the immediate halt of all product development and advised [Plaintiff] that an official response would be provided within the next few days."  (*Id.* ¶ 59.)  Shortly thereafter, LFI abruptly terminated the 2017 Agreement without providing Plaintiff prior written notice or an opportunity to cure the alleged breach upon which the termination was based.  (*Id.* ¶ 63.)

Plaintiff alleges Defendants communicated with other makeup companies before terminating the 2017 Agreement without first consulting with Plaintiff about renewing its Agreement.  (Doc. 28 ¶¶ 61-62.)  According to Plaintiff, Defendants did this "to obtain a

---

[5]The parties agree "[t]he Court can consider the License Agreements and assume their contents are true for purpose of this Motion, because the FAC necessarily relies upon them and incorporates them by reference."  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." (citation omitted)). (Doc. 28 at 1-2; Doc. 31 n.1; Doc 34 at 3.)

more favorable license agreement with a more profitable company." (*Id.*)  Plaintiff alleges Defendants used the "concepts, designs and ideas" from Plaintiff's samples after terminating the 2017 Agreement to launch a new line of products with a larger cosmetics company, Morphe, LLC ("Morphe").  (*Id.* ¶ 65.)

In November 2020, Insider Inc. ("Insider") published an article discussing Defendants' collaboration with Morphe.[6]  (Doc. 28 ¶ 68.)  According to Plaintiff, the article contained defamatory statements made by Defendants and its publication caused "grave damage to [Plaintiff's] business reputation and loss of good-will associated with [Plaintiff's] products."  (*Id.* ¶¶ 71-76.)

In May 2021, Plaintiff filed this lawsuit.  (Doc. 1.)  In December 2021, Plaintiff filed its First Amended Complaint ("FAC") against Defendants, asserting nine claims: (1) Breach of Contract, (2) Breach of Duty of Good Faith and Fair Dealing, (3) Fraud, (4) Unjust Enrichment, (5) Business Defamation, (6) False Advertising in violation of The Federal Lanham Act, 15 U.S.C.A. § 1125, et seq., (7) Trade Libel/Product Disparagement/Injurious Falsehood, (8) Tortious Interference with Business Expectations, and (9) Liability for the Torts, Breaches and Debts of Defendant LFI/Piercing the Corporate Veil.  (Doc. 28 at 17-33.)  Defendants now argue all of Plaintiff's claims should be dismissed because: (1) Plaintiff's breach-of-contract claims are precluded by the express language of the Agreements, (2) Plaintiff's duty-of-good-faith-and-fair-dealing claims are precluded by the express language of the Agreements, (3) Plaintiff's fraud claim is insufficiently pled, (4) Plaintiff's unjust-enrichment claim fails as a matter of law because the validity of the Agreements is not in dispute, (5) Plaintiff's defamation claim fails to allege defamatory statements, (6) Plaintiff's false-advertising claim fails to allege commercial advertising or promotion, (7) Plaintiff's trade-libel claim fails to allege a disparaging statement about the quality of Plaintiff's products, (8) Plaintiff's tortious-interference claim fails to allege a nonspeculative hope of a business expectancy and plead

---

[6]Insider is "a global news and lifestyle publication with hundreds of journalists" from around the world; its mission is to inform and inspire the public with news stories. *Insider,* https://www.insider.com/about (last visited Aug. 3, 2022).  (Doc. 28 ¶ 68.)

a specific loss, and (9) Plaintiff's FAC does not plausibly allege facts showing the corporate veil should be pierced.[7]  (Doc. 31 at 7-20.)

## II. Motion to Dismiss Standard

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  While Rule 8 does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Under Rule 12(b)(6), a party may move to dismiss a claim for relief by asserting "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The complaint, however, must contain more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action."  *Twombly,* 550 U.S. at 555 (quoting 5 Fed. Prac. & Proc. Civ. § 1216 (3d ed.)).

The Court will "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, the Court will not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *see also Iqbal*, 556 U.S. at 679.  In addition, a court "cannot assume any facts necessary to [a plaintiff's] . . . claim that they have not alleged."  *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005).  "Determining whether a

---

[7]Plaintiff alleges all claims against Defendants Frank and LFI.  (Doc. 28 ¶¶ 77-133.) Defendant Frank argues all claims against her should be dismissed because the FAC does not allege she personally entered a contract with Plaintiff or made any statements related to this action.  (Doc. 31 at 13-14.)  Because Plaintiff might be able to pursue alter ego liability, as discussed in section VIII, the Court will not dismiss Defendant Frank at this stage and will allow the claims to proceed with respect to both Defendants.

complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III. Breach of Contract (Count One)

Plaintiff alleges Defendants breached the 2016 and 2017 Agreements by: (1) failing to provide artwork for several products, (2) failing to timely review samples, (3) failing to specify reasons for disapproval of samples, (4) refusing to accept samples, (5) failing to consult Plaintiff before seeking a new third-party licensee, and (6) failing to provide notice and an opportunity to cure.  (Doc. 28 ¶¶ 77-79.)  Defendants argue this count should be dismissed because all six breaches alleged by Plaintiff are "precluded by the language of the License Agreements."  (Doc. 31 at 8.)

The parties agree Arizona law governs Plaintiff's breach-of-contract claims.  Under Arizona law, a plaintiff must prove "existence of a contract between the plaintiff and defendant, a breach of the contract by the defendant, and resulting damage to the plaintiff." *Frank Lloyd Wright Found. v. Kroeter*, 697 F.Supp.2d 1118, 1125 (D. Ariz. 2010).

### 1. Failing to Provide Artwork

In its FAC, Plaintiff alleges Defendants breached section 9 of the License Agreements by "[c]ompletely failing to provide artwork for several products including an eyeshadow [palette], cosmetic bag, nail polish, brush roll and eyeliners."  (Doc. 28 ¶¶ 25, 32, 57, 78(a).)  Defendants argue the FAC only alleges LFI failed to provide artwork for specific products falling under the "additional specific artwork" category, which is subject to an additional fee and delivery schedule agreement between the parties.  (Doc. 31 at 8.)  Defendants contend this claim should be dismissed because Plaintiff failed to allege it complied with these additional requirements.  (*Id.*)  In response, Plaintiff argues the materials at issue do not fall under this "additional specific artwork" category and, therefore, are not subject to the delivery schedule or additional fee requirements.  (Doc. 34 at 3.)

Section 9 of the License Agreements state, in relevant part:

> If a party breaches this Agreement, the other party, in addition

to its other legal or equitable rights or remedies, may serve the breaching party with written notice of such breach. . . . Should the breaching party fail to remedy a material breach within the cure period, then the non-breaching party may terminate this Agreement and the License on the expiration of such cure period.  Licensee acknowledges that a breach by LFI, other than **complete failure to provide Artwork to Licensee**, shall not be deemed material, and shall not entitle Licensee to terminate this Agreement, although Licensee retains its right to seek monetary damages.  (Emphasis added.)

Section 3.1 of the License Agreements define "Artwork" as "LFI's existing artwork, copyrights, characters, shapes, designs, and other distinctive creative elements, (and additional such artwork as may be agreed by the Parties) and the names and logos 'Lisa Frank' and Lisa Frank, Inc.'"  And, Section 3.2 of the License Agreements states if "Licensee requires LFI to modify Artwork or conform it to a specific product application, or to provide any special or additional design, artwork, or packaging design not included in the Artwork ('LFI Work'), Licensee shall pay a fee ('Artwork Fee') to LFI."

Accepting Plaintiff's factual allegations as true and construing the pleadings in the light most favorable to Plaintiff, the Court concludes Plaintiff has stated a breach-of-contract claim by alleging Defendants completely failed to provide artwork.  *See Manzarek*, 519 F.3d at 1031.

**2. Failing to Timely Review Samples**

In its FAC, Plaintiff alleges Defendants breached § 8.2(d) of the 2016 Agreement and § 8.3(d) of the 2017 Agreement by "[f]ailing to review samples in a timely manner, despite receiving countless written notices from [P]laintiff."  (Doc. 28 ¶¶ 23, 32, 44, 78(b).)  Defendants argue Plaintiff's claim is conclusory, fails to mention the date of the alleged notices, the method by which such notices were sent, the addresses of the intended recipients, or the samples each notice addressed.  (Doc. 31 at 9.)  Plaintiff contends it repeatedly stated in the FAC it sent Defendants written notice consistent with the notice requirements in the Agreement.  (Doc. 34 at 4.)  Plaintiff also contends these provisions created an "implied duty" for Defendants to "timely review samples within ten days of

receipt" to comply with the provision.  (*Id.*)

Sections 8.2(d) of the 2016 Agreement and 8.3(d) of the 2017 Agreement state:

> If LFI does not fully approve in writing samples submitted under this Section within ten (10) business days after receipt, **Licensee may send LFI a notice at the address provided in Section 18 demanding that LFI either approve or disapprove the samples**.  Licensee may not manufacture or sell or offer for sale any Licensed Product without approval by LFI as set forth herein.  All disapprovals shall be specific as to reason.  (Emphasis added.)

In the FAC, Plaintiff alleges: "In accordance with the 2016 Agreement § 8.2(d) and the 2017 Agreement § 8.3(d), [it] sent [D]efendants . . . several written notices demanding that [they] either approve or disapprove the samples." (Doc. 28 ¶ 24.)  Plaintiff also alleges Defendants "failed to timely review samples [it] submitted during or about June 2017, despite receiving several written notices from plaintiff demanding same." (Doc. 28 ¶ 32.)  According to Plaintiff, "the vast majority of such samples were still awaiting final review and approval" in November 2017.  (Doc. 28 ¶ 35.)  At this stage in the litigation, Plaintiff has stated enough to proceed on this claim with respect to the samples submitted in June 2017 pursuant to the 2016 License Agreement.  Plaintiff does not allege Defendants failed to timely review any samples other than the June 2017 samples; therefore, to the extent Plaintiff appears to be alleging Defendants violated § 8.3(d) of the 2017 Agreement, it has failed to allege facts supporting such a claim.[8]

### 3. Failing to Specify Reasons for Disapproval

Plaintiff alleges Defendants breached § 8.2(d) of the 2016 Agreement and § 8.3(d) of the 2017 Agreement by failing to specify the reason for disapproving Plaintiff's samples. (Doc. 28 ¶¶ 45, 78(c).)  Defendants argue Plaintiff only makes the vague and conclusory factual allegation that LFI "frequently and unreasonably rejected already-manufactured samples without being specific as to the reason for disapproval." (Doc. 31 at 9.)  Plaintiff

---

[8]The 2016 Agreement was effective from June 6, 2016 through December 31, 2017, whereas the 2017 Agreement was effective after January 1, 2018.  (Doc. 12-1 at 2, 5; Doc. 12-2 at 2.)  Because Plaintiff only alleges it submitted samples in June 2017, only the 2016 Agreement applies.

contends it alleged in the FAC that "on several separate occasions, [D]efendants disapproved samples without being specific as to the reason such sample was disapproved." (Doc. 34 at 4-5.)

Sections 8.2(d) of the 2016 Agreement and 8.3(d) of the 2017 Agreement require Defendants to "be specific as to reason" for "all disapprovals." In the FAC, Plaintiff alleges it sent Defendants "several written notices demanding [they] either approve or disapprove the samples, but such demands were ignored." (Doc. 28 ¶¶ 24, 45, 54, 57.) Contrary to Defendants' suggestion, Plaintiff did specifically allege it submitted samples to them around June 2017 and received no response as to why the samples were not approved. (Doc. 28 ¶¶ 32-33, 35.) At this stage in the litigation, Plaintiff has stated enough to proceed on this claim with respect to the June 2017 samples. Plaintiff does not allege LFI failed to specify reasons for disapproval of any samples other than the June 2017 samples; therefore, to the extent Plaintiff appears to be alleging LFI violated § 8.3(d) of the 2017 Agreement, it has failed to allege facts supporting such a claim.

#### 4. Refusing to Accept Samples for Review

In its FAC, Plaintiff alleges Defendants breached § 8.2(a) of the 2016 Agreement and § 8.3(a) of the 2017 Agreement by refusing to accept samples for review. (Doc. 28 ¶ 78(d).) Defendants argue the License Agreements did not impose any obligation to accept any sample and LFI retained the absolute discretion to reject samples. (Doc. 31 at 9-10.) Plaintiff responds the License Agreements created an implied obligation requiring Defendants to accept samples for review because refusing to do so would "frustrate the entire purpose of the contract" and "prevent the terms therein from being carried out." (Doc. 34 at 5.) Defendants argues this sort of implied obligation cannot, as a matter of law, amount to breach of contract. (Doc. 35 at 4.)

Plaintiff cites no authority for the proposition that an implied obligation, other than breach of the implied covenant of good faith and fair dealing, can constitute a breach of contract under Arizona law, and the Court is unaware of any such authority. (Doc. 34 at 5-9.) Therefore, to the extent Plaintiff argues Defendants breached § 8.2(a) of the 2016

Agreement and § 8.3(a) of the 2017 Agreement, Plaintiff fails to state a claim.  However, Plaintiff can still argue refusing to accept samples for review constitutes breach of the implied covenant of good faith and fair dealing as alleged in Count Two.

**5. Seeking a License Agreement with Third Parties**

In its FAC, Plaintiff alleges Defendants breached § 5.2(j) of the 2017 Agreement by "seeking a more favorable license agreement with other companies" before terminating the 2017 Agreement.  (Doc. 28 ¶¶ 60-62, 78(e).)  Defendants argue this section expressly allows LFI to communicate with other potential licensees and, in any event, the provision requiring Defendants to consult with Plaintiff about renewal is inapplicable because it only applies to actions occurring during the last six months of the 2017 Agreement.  (Doc. 31 at 10.)  Plaintiff contends Defendants were required to consult with it about renewing the Agreement for an additional term before discussing future licensing arrangements with third parties.  (Doc. 34 at 5.)

Section 5.2(j) of the 2017 Agreement states:

> **Nothing in this Agreement prohibits LFI from discussing future (i.e. after the end date) licensing arrangements for the Licensed Products with any third party at any time**. **During the six months ending with expiration of the Term**, LFI and/or any prospective new licensee may show, publicize, advertise, and/or take advance orders for Licensed Products in the Territory (such rights are unrestricted outside the Territory) provided, however, that LFI shall have consulted with Licensee about renewing this Agreement for an additional term before seeking any new licensee.  (Emphasis added.)

Here, Plaintiff only alleges Defendants were "seeking a more favorable license agreement" prior to the termination of the agreement.  Nothing in § 5.2(j) of the 2017 Agreement precludes Plaintiff from "seeking a more favorable license agreement" with someone else.  The only limitation in § 5.2(j) is the provision requiring LFI to consult with Plaintiff, which only applies if LFI and/or a prospective new licensee show, publicize, advertise, and/or take advance orders between July 2018 and December 2018—the six months ending with expiration of the term.  Plaintiff fails to allege LFI and/or a prospective

- 10 -

new licensee showed, publicized, advertised, or took advance orders for Licensed Products between July 2018 and December 2018.  Therefore, Plaintiff has failed to state a claim and allege facts sufficient to establish Defendants breached section 5.2(j) of the 2017 Agreement.

### 6. Failing to Provide Notice and Opportunity to Cure

Plaintiff alleges § 9 of the 2017 Agreement "mandate[s] that [Plaintiff] be provided prior written notice and an opportunity to cure" any alleged breach before Defendants can terminate the Agreement, and LFI Defendants breached § 9 by "[f]ailing to prov[ide] written notice upon termination or an opportunity to cure any purported breach."  (Doc. 28 ¶¶ 63, 78(f).)  Defendants argue this "assertion is utterly frivolous, as § 10 of the 2017 Agreement "provides LFI the express right to immediately terminate the agreement" and "[e]xercising that express contractual right cannot be a breach of that contract."  (Doc. 31 at 10.)  Plaintiff does not meaningfully respond to this argument and merely restates § 9 of the 2017 Agreement and asserts Defendants "abruptly" terminated the Agreement without giving Plaintiff notice and an opportunity to cure any purported breach.  (Doc. 34 at 6.)

Section 9 of the 2017 Agreement provides, in relevant part:

> If a party breaches this Agreement, the other party, in addition to its other legal or equitable rights or remedies, **may** serve the breaching party with written notice of such breach.  **Subject to Section 10**, the breaching party shall then have twenty (20) days from the date of such notice to cure such breach . . . . (Emphasis added.)

And, § 10 states:

> **Notwithstanding Section 9**, LFI, in addition to any other rights, **may terminate this Agreement immediately for material breach** upon any one of the following [ten] occurrences." (Emphasis added.)

Plaintiff does not allege LFI gave any reason for terminating the 2017 Agreement or identify any purported breach upon which LFI based the termination.  However, under § 10 of the Agreement, LFI was permitted to immediately terminate the Agreement for material breach without notice.  In contrast, if there was an immaterial breach, LFI could *choose* to "serve [Plaintiff] with written notice of such breach" pursuant to § 9.  That is,

neither provision expressly *required* LFI to give Plaintiff notice and an opportunity to cure the purported breach; the Agreement merely provided the procedure by which a breaching party could cure a breach, if the non-breaching party chose to give the breaching party notice and an opportunity to cure.  Therefore, Plaintiff fails to state a claim upon which relief may be granted with respect to § 9 of the 2017 Agreement.

### IV. Breach of Duty of Good Faith and Fair Dealing (Count Two)

Plaintiff alleges Defendants breached the implied covenant of good faith and fair dealing because Defendants acted in bad faith by "actively, intentionally hinder[ing]" Plaintiff's efforts to fulfill its contractual obligations."  (Doc. 28 ¶¶ 22, 41, 51, 75, 80-84.) Specifically, Plaintiff alleges Defendants entered into the Agreements without intending to fulfill their terms and obligations, failed to provide artwork, refused to receive samples for review, demanded early payment of royalties while knowing they would immediately cancel the Agreement after payment, exercised "contractual rights in a predatory manner," thus depriving Plaintiff of the benefit of the bargain, acted with malice or reckless disregard for Plaintiff's rights, and intentionally stalled and delayed the production process to prevent Plaintiff from obtaining the contractual benefits to which Defendants had already availed themselves.  (Doc. 28 ¶ 83.)

Defendants argue Count Two is precluded by the express language of the Agreements because it "granted LFI absolute discretion to reject samples for any reason" and there is no implied obligation to create additional artwork or accept samples. (Doc. 31 at 10-11; Doc. 35 at 7.)  Defendants also argue Plaintiff provides no facts to support that they intentionally lost and misplaced various samples, or that Defendants "had no intention of fulfilling the terms and obligations" of the Agreements.  (Doc. 31 at 11; Doc. 35 at 6-7.) In response, Plaintiff contends Defendants exercised their discretion to reject samples in a manner inconsistent with Plaintiff's reasonable expectations.  (Doc. 34 at 9.)  Plaintiff also asserts whether Defendants' conduct amounts to a breach of duty of good faith is a question of fact for the jury, which should not be decided on a motion to dismiss.  (Doc. 34 at 9.)

A covenant of good faith and fair dealing is legally implied in every contract to

prohibit a party from acting in a way that would prevent another party from receiving the benefits and entitlements of their agreement. *Wells Fargo Bank v. Ariz. Laborers*, 38 P.3d 12, 28 (Ariz. 2002). A party breaches the covenant of good faith and fair dealing by exercising discretion under the contract in such a way as to deny the other party a reasonably expected benefit of the bargain. *Id.* at 28-30.

Here, Plaintiff alleges Defendants did not act in good faith, deal fairly, or abide by their contractual duties. (Doc. 28 ¶¶ 80-84.) To the extent Plaintiff has stated a breach-of-contract claim, its breach of implied covenant of good faith and fair dealing survives, as well. Moreover, at this stage in the litigation, Plaintiff has alleged enough facts to support its assertion Defendants' behavior deprived Plaintiff of reasonably expected benefits under the Agreements. Specifically, Plaintiff alleges Defendants: refused to accept samples; entered into the License Agreements without an intent to fulfill their terms and obligations; demanded an early royalty payment with no intent to continue the 2017 Agreement; and intentionally stalled and delayed the production process by, among other things, intentionally losing and misplacing samples. (Doc. 28 ¶¶ 78(d), 83.) Therefore, Plaintiff has stated a claim for breach of the implied covenant of good faith and fair dealing.

### V. Fraud (Count Three)

Plaintiff alleges Defendants are liable for fraud because they knowingly made two material and false representations, upon which Plaintiff detrimentally relied. (Doc. 28 ¶¶ 85-89.) Specifically, Plaintiff alleges Defendants made fraudulent statement when: (1) Janice Ross, Vice President of LFI, "stated the Kickstarter products would be produced and distributed by June 2018"; and (2) Defendants "demanded [P]laintiff make an early royalty payment and stated that, upon receipt of such payment, [they] would comply with their contractual obligations." (Doc. 28 ¶¶ 86-87.)

Defendants argue Plaintiff has failed to state a fraud claim because it has not sufficiently pled fraud under Fed. R. Civ. P. 9(b). (Doc. 31 at 11; Doc. 19 at 7-8; Doc. 35 at 8.)[9] In response, Plaintiff contends it sufficiently alleged facts to survive a motion to

---

[9]Throughout their pleadings on the instant Motion, both sides refer to arguments in their briefing on Defendants' prior motion to dismiss. That motion, however, was

dismiss, and the truth and materiality of the alleged misrepresentations cannot be decided at the pleading stage because such determinations involve factual issues.  (Doc. 34 at 9-10.)

"A showing of fraud requires (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; (9) his consequent and proximate injury." *Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 631 (Ariz. 1982).  Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*  "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quotations and citations omitted)).

With respect to representation one, Plaintiff alleges Ross acted on behalf of Defendants when she said Kickstarter products would be produced and distributed by June 2018.  (Doc. 28 ¶ 86.)  Defendants argue Plaintiff does not particularly identify what Ross said, how the statement was false or misleading, whether Ross had an intent to not perform when she made the statement, and how Plaintiff relied on or was damaged by Ross's statement.  (Doc. 31 at 11; Doc. 19 at 7; Doc. 35 at 8.)  The Court disagrees, as Plaintiff alleges: Ross's statement was fraudulent because she knew "such products would not be produced by such date"; Defendants made the statement without intending to comply in

dismissed as moot and Plaintiff's original complaint was superseded by the FAC. Referring to arguments made in previously mooted pleadings is improper and appears to be an attempt to circumvent the page limits set forth in the Local Rules.  For this reason, the Court could strike the parties' pleadings; however, in the interest of judicial economy, the Court will consider those arguments.  Going forward, the parties shall not engage in such practice and are advised any future reference to arguments made in previously mooted pleadings will not be considered and may result in the Court striking the offending pleading without further notice.

the specified timeframe; and Plaintiff detrimentally relied on Defendant's misrepresentation by making arrangements in accordance with that timeframe.  (Doc. 28 ¶ 86.)  Accepting Plaintiff's factual allegations as true and construing the pleadings in the light most favorable to Plaintiff, the Court concludes Plaintiff has stated a fraud claim with respect to Ross's statement.  *See Manzarek*, 519 F.3d at 1031.

With respect to representation two, Plaintiff alleges Defendants claimed they would comply with their contractual obligations only if Plaintiff made an early royalty payment, when they knew "such statements were false" because they "never intended to fulfill such promises to [P]laintiff."  (Doc. 28 ¶¶ 86-87.)  Defendants argue Plaintiff cannot state a fraud claim because "there was nothing false about" LFI's statement because LFI "really was demanding payment" and "really was not going to continue performing until paid." (Doc. 31 at 11; Doc. 19 at 7-8; Doc. 35 at 8.)   Further, Defendants contend Plaintiff does not allege it complied with the demand and even if it had, "Plaintiff does not (and cannot) plausibly plead damages as a result of issuing payment nine days early."  (Doc. 19 at 7-8.) Plaintiff's claim, however, is not based on whether Defendants made such a demand—that much appears to be admitted by both parties.  Rather, Plaintiff's claim appears focused on Defendants promising to continue to fulfill contractual obligations if an early payment was made.  Contrary to Defendants' suggestion, Plaintiff does allege it "tendered [the early] payment" to Defendants and Plaintiff also alleges it was damaged because Defendants never intended to and never did resume their contractual obligations.  (Doc. 28 ¶¶ 58, 86(b), 87.)  Therefore, Plaintiff has alleged enough to state a fraud claim for this representation.

**VI. Unjust Enrichment (Count Four)**

Plaintiff alleges unjust enrichment based on Defendants wrongfully receiving over $750,000 from Plaintiff while preventing Plaintiff from using and selling Licensed Products.  (Doc. 28 ¶¶ 93-95.)  Defendants argue Plaintiff's unjust-enrichment claim fails as a matter of law because Plaintiff does not dispute the validity of the License Agreements. (Doc. 31 at 11.)   In other words, Defendants argue Plaintiff cannot pursue unjust enrichment as an alternative claim because the validity of the contract is not in doubt.  (Doc.

35 at 7.)  Plaintiff acknowledges it cannot simultaneously recover damages under both theories, but contends it is entitled to pursue unjust-enrichment as an alternative to a breach-of-contract claim.  (Doc. 34 at 11.)

Under Arizona law, an unjust-enrichment claim requires proof of "five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011).  "[I]f there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application," but a plaintiff may plead an unjust-enrichment claim in the alternative, in case a contract is found to be invalid or plaintiff is found to be the breaching party.  *Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485, 492-93 (Ariz. Ct. App. 2002) (citations and internal quotation marks omitted).  That is, the mere existence of a contract governing the dispute does not automatically bar unjust enrichment as an alternative theory of recovery.  *Adelman v. Christy*, 90 F. Supp. 2d 1034, 1045 (D. Ariz. 2000).  However, unjust enrichment is unavailable to a plaintiff who has already received the benefit of her contractual bargain.  *Id.*

Although Defendants moved to dismiss this count, they provide no meaningful argument.  Accordingly, the Court finds Plaintiff has sufficiently pled the elements of unjust enrichment and denies Defendants' Motion to Dismiss on this count.

**VII. Claims Related to Insider Article (Counts 5-8)**

Plaintiff alleges various claims related to an article published by Insider around November 2020, including: defamation per se; false advertising; trade libel; and piercing the corporate veil.  (Doc. 28 ¶¶ 68-69.)  The following excerpt appears in the article:

> In an email previously sent to Insider, a representative for Lisa Frank Inc. said it "entered into a business arrangement" with Glamour Dolls "several years ago."
>
> "Unfortunately, Glamour Dolls completely failed to live up to our agreement, which includes their obligations within the Kickstarter campaign, failing to manufacture and deliver the products that our fans rightfully deserved," the representative

said. "The Lisa Frank Company knows how you feel, as we did not receive what Glamour Dolls promised us either."

"After many months of pushing Glamour Dolls to live up to its contractual obligations and deliver products—to our fans and retailers that ordered products—Lisa Frank Inc. reached the point of exasperation, terminated the agreement with Glamour Dolls, and contacted the Federal Government," the statement continued. "To say we are disappointed by the events that transpired as a result of this license is an understatement."

The Lisa Frank Inc. representative said the company was "excited about the upcoming collection" with its "trusted partners at Morphe" and that it knew Lisa Frank fans would "love these quality cosmetics that bring the joy of Lisa Frank to life."

(Doc. 12-3 at 9.)

Defendants make several arguments as to why these counts should be dismissed. (Doc. 31 at 12-14.) The Court will address each in turn.

### 1. Defamation Per Se (Count Five)

Defendants argue Plaintiff's defamation claim should be dismissed because it has not alleged facts suggesting Defendants made any defamatory statements. (Doc. 31 at 12; Doc. 35 at 5.) According to LFI, the only statement attributed to it in the FAC is a statement made by an unknown LFI representative saying Plaintiff "failed to live up to" its contract. (Doc. 35 at 5.)

Plaintiff argues it sufficiently stated a claim by alleging various statements capable of bearing a defamatory meaning. (Doc. 34 at 11-12.) Specifically, Plaintiff claims the FAC includes several statements published in the Insider article which "prejudiced Plaintiff in the conduct of its business," which constitutes defamation per se. (*Id.*) Plaintiff also argues the determination of whether a defamatory meaning was conveyed by the statements is for a jury to decide because Plaintiff has alleged a statement capable of bearing a defamatory meaning. (*Id.*)

"A defamation action compensates damage to reputation or good name caused by

the publication of false information." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989). To state a claim for defamation under Arizona law, a plaintiff must allege: (1) the defendants made a false and unprivileged statement; (2) the statement was published or communicated to someone other than the plaintiff; and (3) the statement tends to harm the plaintiff's reputation. *See id.*; *Lundin v. Discovery Commc'ns Inc.*, 352 F. Supp. 3d 949, 960 (D. Ariz. 2018). "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *See Godbehere*, 783 P.2d at 787. Whether a publication can bear a defamatory meaning is a question of law for the court to decide. *Yetman v. English*, 811 P.2d 323, 331 (Ariz. 1991). If the court makes such a determination, it can then either find as a matter of law that such meaning was actually conveyed, or it can submit the matter to a jury if it involves a question on which reasonable people may differ. *Id.*

Slander is the publication of defamatory statements by spoken words. *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1161 (D. Ariz. 2013) (citing Restatement (Second) of Torts § 568 (1977)). An utterance is slander per se when its publication "tends to injure a person in his profession, trade or business." *Modla v. Parker*, 495 P.2d 494, n.1 (Ariz. Ct. App. 1972). However, such an utterance "must be of or concerning one in [a] business capacity." *Id.* at 56.

Here, Plaintiff alleges Defendants are liable of defamation per se for publishing statements tending to prejudice Plaintiff in the conduct of its business or deterring others from dealing with it. (Doc. 28 ¶ 98.) Specifically, Plaintiff alleges Defendants "made several false, disparaging statements about [Plaintiff's] business practices, ethics, credibility and products to Insider in an effort to portray [Plaintiff] as corrupt, untrustworthy and incompetent and to deter consumers and third parties from dealing with [Plaintiff]." (Doc. 28 ¶ 69.) Liberally construed, the Court finds LFI's statements to Insider about Plaintiff can reasonably be interpreted as harming Plaintiff's business reputation. Specifically, the statement from LFI's representative that Plaintiff completely

failed to manufacture and deliver products is capable of bearing a defamatory meaning. *Cf. Ultimate Creations, Inc. v. McMahon*, 515 F. Supp. 2d 1060, 1065-67 (D. Ariz. 2007) (statements about former employee being fired because he was unprofessional and did not honor his contractual obligations were reasonably capable of a defamatory per se meaning). These statements above may have damaged Plaintiff's business reputation by suggesting Plaintiff is unable to manufacture and deliver products in accordance with a license agreement.  Therefore, the Court finds Plaintiff alleged statements are reasonably capable of a defamatory meaning, so Plaintiff has stated a defamation per se claim on this count.

### 2. False Advertising under Lanham Act (Count Six)

Defendants argue Plaintiff's false-advertising claims under the Lanham Act, 15 U.S.C. § 1125, et seq., fail because the statements referenced in the FAC were not "commercial advertising or promotion," as they were not an advertisement and could not amount to commercial speech. [10]  (Doc. 31 at 12 (citing Doc. 12 at 14-15); Doc. 35 at 6.) Alternatively, Defendants argue even if the statements could be classified as commercial speech, they are "non-actionable puffery."  (Doc. 31 at 12 (citing to Doc. 12 at 14-15); Doc. 35 at 6.)  In response, Plaintiff asserts it has sufficiently pled Defendants engaged in commercial speech because "the article at issue was an advertisement because it was written solely to promote [D]efendants' new makeup line and refers to several particular products, including the Kickstarter products referenced in [P]laintiff's Amended Complaint."  (Doc. 34 at 13.)   Plaintiff also argues Defendants were economically motivated to make these statements to sell their new products and "evoke public distrust in [P]laintiff's products."  (*Id.*)  Furthermore, Plaintiff asserts LFI's statements are not "mere puffery" because the statements "specifically denigrate[d] the quality of [P]laintiff's products and business practices, which directly induced consumer reliance."  (Doc. 34 at

---

[10]In their Reply, Defendants argue Plaintiff failed to allege commercial speech because it did not allege the statements were made to influence consumers to buy goods. (Doc. 35 at 6.)  Although Defendants raised this argument in their first motion to dismiss, they did not raise it in the operative motion to dismiss and waited until their Reply. (*See* Doc. 35; Doc. 12 at 14-15.)  Therefore, Plaintiff did not have a chance to respond to this argument and the Court will not consider it.  *See WildEarth Guardians v. Jewel*, 134 F. Supp. 3d 1182, n. 65 (D. Ariz. 2015) (arguments raised for first time in reply are untimely).

12-14.)

### a. Commercial Speech

To establish a false-advertising claim under the Lanham Act, a plaintiff must allege "a false or misleading representation of fact in commercial advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020) (internal quotations omitted). "Commercial advertising or promotion" is "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1054 (9th Cir. 2008).

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Arrix, LLC*, 985 F.3d at 1115 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). However, courts view this definition as a mere starting point and "instead try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *Id.* (quoting *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014)) (quotations omitted). This is a fact-intensive analysis and even "speech that does not propose a commercial transaction on its face can still be commercial speech." *Id.* "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where (1) the speech is an advertisement, (2) the speech refers to a particular product, and (3) the speaker has an economic motivation." *Id.* at 1116 (citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 67 (1983)). These *Bolger* factors are "important guideposts, but they are not dispositive." *Id.*

Here, the parties focus on whether the statement from LFI's representative in Insider's article qualifies as commercial speech—the first element in determining whether there is "commercial advertising or promotion." Plaintiff alleges LFI's representative

made statements discussing a poor business relationship with Plaintiff and indicating LFI "was 'excited about the upcoming collection' with its 'trusted partners at Morphe'" and their "quality cosmetics." (Doc. 12-3 at 9). The statements in question might be seen as an advertisement because they reference the Kickstarter products that never were made and seemingly promote LFI's new line of products with Morphe. LFI's representative also appears to have an economic motivation to promote the economic and financial success of Defendants, improve Defendants' image, and create more exposure for Defendants' new products with Morphe. Therefore, at this stage, the Court finds Plaintiff has alleged enough facts to plausibly support that Defendants engaged in commercial speech.

### b. Puffery

"[T]he determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008). As the Ninth Circuit has pointed out,

> A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim. The common theme that seems to run through cases concerning puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Thus, a statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.

*Id.* (internal citations and quotation marks omitted) (citing *Cook, Perkiss, & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 245-46 (9th Cir. 1990)). Further, "[p]uffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (internal quotation marks omitted).

Here, the statements at issue are not mere puffery because they are not subjective claims about a product, nor are they a form of exaggerated advertising, blustering, or

boasting upon which no reasonable buyer would rely.  *See id.*  LFI's representative remarked, "'[Plaintiff] completely failed to live up to our agreement . . . failing to manufacture and deliver the products that our fans rightfully deserved.'"  (Doc. 12-3 at 9.)  Further, the representative stated: "After many months of pushing [Plaintiff] to live up to its contractual obligations and deliver products . . . [LFI] reached the point of exasperation, terminated the agreement with [Plaintiff], and contacted the Federal Government."  (*Id.*)  On its face, these statements might induce consumers to avoid Plaintiff's products, as the statements depict the Plaintiff as a company that "completely fails" to deliver products and abide by its promises.  (*Id.*)  This is a quantifiable claim concerning Plaintiff's undelivered products.  Therefore, Plaintiff has sufficiently alleged the statements are not mere puffery.

### 3. Trade Libel (Count Seven)

Defendants argue Plaintiff's trade-libel claim should be dismissed because the FAC does not contain "any disparaging statement about the quality of [Plaintiff]'s products."  (Doc. 31 at 12; Doc. 12 at 15.)  According to Defendants, the alleged statements "at best, relate to Plaintiff's contractual services, not its products."  (Doc. 12 at 15.)  Plaintiff asserts Defendant's "statement to Insider directly references and disparages the quality of [its] products by insinuating that such products were not fit for use by consumers."  (Doc. 34 at 14.)  In their Reply, Defendants contend the only statements relating to Plaintiff's products were statements made by consumers—not Defendants.  (Doc. 35 at 6.)

To adequately state a trade-libel claim, a plaintiff must show defendants intentionally published an injurious falsehood disparaging the quality of its property with resulting pecuniary loss.  *Gee v. Pima Cnty.*, 612 P.2d 1079, 1079-80 (Ariz. Ct. App. 1980).  Here, the only statements relevant to Plaintiff's claim are those made by LFI's representative, not statements made by consumers.  The Court finds the statement can be construed as disparaging Plaintiff's property, i.e. Plaintiff's business.  *Cf. Allen v. Quest Online, LLC*, No. CV-11-138-PHX-GMS, 2011 WL 4403674, at *8 (D. Ariz. Sept. 22, 2011) (dismissing case that made no reference to libelous activity about Plaintiff's product or business). Therefore, the Court finds the FAC adequately pleads a claim for trade libel

1    at this stage.

2                    **4. Tortious Interference (Count Eight)**

3          Defendants argue Plaintiff's tortious-interference claim should be dismissed

4    because the FAC only vaguely alleges "speculative hope of a business expectancy" and

5    fails "to plead a 'specific loss because of [LFI's] alleged interference.'" (Doc. 31 at 12-

6    13.)  Plaintiff argues it was not mere speculative hope because there were "fail-safe

7    expectancies and relationships which would have doubtlessly continued but for defendants'

8    tortious interference." (Doc. 34 at 15

9          To state a tortious-interference claim, a plaintiff must allege "the existence of a valid

10   contractual relationship or business expectancy; the interferer's knowledge of the

11   relationship or expectancy; intentional interference inducing or causing a breach or

12   termination of the relationship or expectancy; and resultant damage to the party whose

13   relationship or expectancy has been disrupted." *Dube v. Likins*, 167 P.3d 93, 98 (Ariz. Ct.

14   App. 2007) (quoting *Miller v. Hehlen*, 104 P.3d 193, 202 (Ariz. Ct. App. 2005)).  To state

15   a plausible claim for relief, the plaintiff must be able to "identify a specific relationship

16   with which the defendant interfered"; the speculative hope of a business expectancy is not

17   enough. *Id.* at 101.

18         Here, Plaintiff alleges "third parties with which [it] had previously dealt and/or

19   which had expressed interest in collaborating with [it] prior to the article's publication,

20   including, but not limited to, MGD Solutions, Inc., Kickfurther and H-E-B Grocery

21   Company, LP, abruptly backed out and refused to speak or even communicate with [it]."

22   (Doc. 28 ¶ 125.)  Because Plaintiff alleged specific relationships with third parties, with

23   which it had previously dealt, or had received interest from, it has sufficiently identified

24   specific relationships involving business expectancies in its FAC.  Plaintiff also alleges, it

25   suffered economic damages, loss of business, and loss of good will, due to Defendant's

26   actions.  (Doc. 28 ¶ 127.)  Therefore, Defendants have not shown Plaintiff failed to state a

27   claim on this ground.  Because Defendants do not seek dismissal of Plaintiff's claim on

28   any other basis, dismissal is not warranted.

- 23 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VIII. Piercing the Corporate Veil (Count Nine)**

Plaintiff alleges the way Defendant Frank operated Defendant LFI justifies piercing the corporate veil to make her individually liable for LFI's debts and liabilities.  (Doc. 28 ¶ 129.)  Defendants argue Count Nine must be dismissed because piercing the corporate veil is not "a cognizable standalone claim under Arizona law," and even if it was, Plaintiff's FAC does not plausibly allege facts showing unity of control or that observing the corporate form would promote a fraud or injustice.  (Doc. 31 at 14-16.)

**1. Alter Ego as Derivative Cause of Action**

Under Arizona law, alter ego is not a standalone claim, but rather a derivative claim tied to some other substantive cause of action such as ones based on contract or tort. *Specialty Cos. Grp., LLC v. Meritage Homes of Ariz., Inc.*, 492 P.3d 308, 310 (Ariz. 2021); *see also Farmers Ins. Co. of Arizona v. DNS Auto Glass Shop LLC*, No. CV-21-01390-PHX-DGC, 2022 WL 845191, at *2 (D. Ariz. Mar. 22, 2022); *Five Points Hotel P'ship v. Pinsonneault*, No. CV-11-00548-PHX-JAT, 2014 WL 1713623, at *5 (D. Ariz. May 1, 2014) ("[T]he Court concludes that Arizona law does not recognize alter ego as an independent cause of action[.]").

Defendants have not cited, and the Court is unaware of, any binding authority suggesting alter ego cannot be pled as a separate count.  Courts have allowed alter ego to be pled as a separate count where plaintiffs have raised substantive claims upon which to base alter-ego liability.  *See, e.g.*, *Airbus DS Optronics GmbH v. Nivisys LLC*, 183 F. Supp. 3d 986, 990 (D. Ariz. 2016) (denying "overly formulistic" request to dismiss alter ego claim because it was stated as standalone count); *Jes Solar Co. v. Matinee Energy, Inc.*, No. CV 12-626 TUC DCB, 2015 WL 10943562, at *6 (D. Ariz. Nov. 2, 2015) (same, noting that stating alter ego as a separate count "is merely a pleading mechanism to highlight Plaintiffs' intention to proceed on these theories of liability in respect to the substantive claims").

Here, the Court will treat Count Nine as a theory of derivative liability, rather than an independent cause of action, with respect to the contract and tort claims.

### 2. Plaintiff Has Plausibly Pled Alter Ego

Under Arizona law, a court will pierce the corporate veil and hold officers of a company personally liable "when the corporation is the alter ego or business conduit of a person, and when to observe the corporation would work an injustice." *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. Ct. App. 1972). A corporation is considered the alter ego of an individual when "there is such unity of interest and ownership that the separate personalities of the corporation and owners cease to exist." *Id.* In determining whether a unity of interest and ownership exists, court consider: the commingling of funds between the individual and the entity; that individual's use of the entity's assets or funds; inadequate capitalization; disregard of corporate formalities; and a lack of segregation of corporate records. *PlusFive Claims, LLC v. 0713401 B.C. Ltd.*, No. 10-1561 SC, 2011 WL 902015, at *6 (N.D. Cal. Mar. 14, 2011); *see also Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195-96 (Ariz. Ct. App. 1994).

Here, the FAC alleges corporate Defendant LFI is the alter ego of Defendant Frank. (Doc. 28 ¶ 129.) Plaintiff claims Frank—operating as the sole owner, founder, president, and CEO of LFI—controlled LFI's assets and operations "to the point that the separate practical day-to-day identities of each ceases to exist" and commingled personal and corporate funds by having the royalty payments associated with these License Agreements deposited into her personal trust account. (*Id.* ¶ 130.) The FAC also alleges Frank used the corporate capital of LFI for personal, private purposes, thereby depleting the corporate reservoir of assets which otherwise would be available to creditors. (*Id.* ¶ 130(e).) Lastly, Plaintiff alleges adherence to the legal fiction of the separate existence of corporate Defendant LFI would "sanction a fraud and/or promote injustice" because Frank employed LFI for fraudulent, illegitimate, and unlawful purposes. (*Id.* ¶¶ 131-33.)

These allegations contain sufficient factual assertions which, when accepted as true, state a claim for piercing the corporate veil. Not only do these allegations support a unity of interest between Defendant Frank and Defendant LFI, but Plaintiff also specifically alleges, "under the particular circumstances" of this case, observing the corporation would

"sanction a fraud and/or promote injustice." (Doc. 28 ¶ 131.) Therefore, the Court finds Plaintiff has stated a claim under alter ego/piercing the corporate veil liability.

Accordingly,

**IT IS ORDERED**

1. Defendant's Motion to dismiss (Doc. 31) is GRANTED in-part as to parts of Count One relating to breach of contract for: failing to timely review samples under 2017 Agreement, failing to specify reasons for disapproval under 2017 Agreement, refusing to accept samples for review, seeking a license agreement with third parties, and failing to provide notice and opportunity to cure. These claims are dismissed.

2. Defendant's Motion to dismiss (Doc. 31) is DENIED in-part as to parts of Count One relating to breach of contract for: failure to provide artwork, failing to timely review samples under 2016 Agreement, failing to specify reasons for disapproval under 2016 Agreement.

3. Defendant's Motion to dismiss (Doc. 31) is DENIED in-part as to Counts Two, Three, Four, Five, Six, Seven, Eight, and Nine.

Dated this 4th day of August, 2022.

Honorable Scott H. Rash
United States District Judge