Laura Sixkiller, SBN 022014
laura.sixkiller@gtlaw.com
Shalayne L. Pillar, SBN 034066
shalayne.pillar@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Tel: (602) 445-8000
Fax: (602) 445-8100

*Attorneys for Defendants/Counterclaimant*
*Lisa Frank, Inc. and Lisa Frank*

# UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Glamour Dolls, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Lisa Frank, Inc.; and Lisa Frank, in her individual and corporate capacity,<br><br>Defendants.<br><hr>Lisa Frank, Inc.,<br><br>Counterclaimant,<br><br>vs.<br><br>Glamour Dolls, Inc.,<br><br>Counterdefendant. | Case No. 4:21-CV-0228-TUC-SHR<br><br>**DEFENDANTS'/COUNTER-CLAIMANT'S STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

In accordance with LRCiv 7.2(e), Lisa Frank, Inc. and Lisa Frank (collectively, "**Defendants**") submit this Statement of Facts in support of their Motion for Summary Judgment.

## I.   THE PARTIES

1. Lisa Frank Inc. ("**LFI**") is beloved around the globe for its whimsical character world and colorful lifestyle aesthetic. For over four decades, LFI has spread happiness and joy with millions of fantastic products. [L. Frank Decl. ¶¶ 2, 5, attached as **Exhibit 1**.]

2. Although LFI used to manufacture its own goods, for the last 12 years, LFI has focused its efforts on developing and licensing its brand. [Ex. 1 ¶ 4.]

3. Glamour Doll Inc. ("**Plaintiff**") describes itself as a cosmetic company committed to creating quality, imaginative, cruelty-free, vegan makeup at an accessible price point. According to Plaintiff, it typically would enter profit sharing agreements, handling the manufacturing distribution, while working alongside a contract partner or licensor (such as LFI) to develop the product, color, and design. [Email from P. Georgotas to S. McPhillips (April 15, 2016), attached as **Exhibit 2**.]

## II.   THE FIRST AGREEMENT: JUNE 6, 2016–DECEMBER 31, 2017.

4. On June 6, 2016, Plaintiff and LFI entered into a License Agreement ("**First Agreement**"). [First Agreement (Doc 12-1); *see also* Plf.'s Answer (Doc. 42) ¶ 10.]

5. Lisa Frank, in her individual capacity, was not a party to the First Agreement. [*See* First Agreement.]

6. Under the First Agreement, LFI granted Plaintiff a "non-exclusive, non-transferable, non-assignable license to manufacture, use and sell" certain products incorporating "LFI's Artwork[1] and/or Trademarks" in a certain territory. [*Id.* § 1.1.] The term of this license expired on December 31, 2017. [*Id.* § 5.1.]

7. The "Artwork" licensed included LFI's "existing artwork" *only*; new or additional artwork required an additional fee and agreed upon delivery schedule. [*Id.* §§ 3.1,

---

[1] Capitalized terms not otherwise defined herein have the same meaning ascribed to them in the First Agreement or Second Agreement, as applicable.

1

3.2.]

8.      In exchange for this limited non-exclusive license, Plaintiff agreed to pay LFI a royalty of 15% of net sales of Licensed Products accruing at the time of sale. [*Id.* §§ 6.1, 6.4.] Plaintiff further agreed to a guaranteed minimum royalty ("**GMR**") of $100,000, including a nonrefundable advance of $25,000. [*Id.* § 6.2.]

9.      Plaintiff also agreed to "use its best efforts to make and maintain timely and adequate arrangements to, and actively manufacture, distribute, promote, market and sell the Licensed Products, and . . . procure the greatest volume of sales of the Licensed Products throughout the Territory consistent with high quality." [*Id.* § 4.1.]

10.     Plaintiff's licensing rights were at all times conditioned upon LFI's express approval. [*Id.* §§ 8.2, 8.3.]

11.     For example, the First Agreement required Plaintiff to obtain LFI's written approval of all concepts, design elements, and artwork. [*Id.* § 8.1.]

12.     Following that approval, and before manufacturing any Licensed Product, the First Agreement required Plaintiff to submit two "Preproduction Samples" to LFI, which LFI would approve or disapprove "in its sole discretion." [*Id.* § 8.2(a).]

13.     Before shipping any Licensed Product, the First Agreement then required Plaintiff to submit two "Pre-Shipment Samples," also subject to LFI's approval in its sole discretion. [*Id.*]

14.     Once Plaintiff commenced regular manufacturing of the Licensed Product, but prior to shipment to customers, the First Agreement required Plaintiff to provide a third round of samples to LFI—defined in the First Agreement as "Manufactured Samples," requiring Plaintiff to gain approval for the same packaging and displays to be shipped to customers. [*Id.*]

15.     If LFI did not approve or disapprove of Plaintiff's submitted samples at any stage, within 10 business days, Plaintiff could send LFI a written notice demanding that LFI issue an approval or disapproval, and, for a disapproval, provide a specific reason. [*Id.* §§ 8.2(d), 18.]

16.     Even after approval, LFI retained the right to "discontinue the manufacture and

2

distribution" of any Licensed Product for failure to meet LFI's quality standards. [*Id.* § 8.2(e).]

17. The First Agreement also required Plaintiff to obtain written approval of all advertising, promotional, and product packaging before any use. [*Id.* § 8.3.]

18. The First Agreement provided LFI the right to terminate under several circumstances including Plaintiff's failure to adhere to the approval process (Section 8.2) or use their best efforts to exploit the license provided (Section 4.1). [*Id.* § 10.]

### III. THE SECOND AGREEMENT: JANUARY 1, 2018–JULY 3, 2018.

19. At the end of the First Agreement, Plaintiff and LFI entered into a second agreement, for a one-year term ("**Second Agreement**"). [Second Agreement (Doc. 12-2); *see also* Plf.'s Answer (Doc. 42) ¶ 26.] The terms of the Second Agreement were identical in most respects to the First Agreement. [*Compare* Docs. 12-1 and 12-2.]

20. Similar to the First Agreement, Lisa Frank, in her individual capacity, was not party to the Second Agreement. [*See* First Agreement.]

21. Like the First Agreement, the Second Agreement granted Plaintiff a "non-exclusive, non-transferable, non-assignable license to manufacture, use and sell" certain products incorporating "LFI's Artwork and/or Trademarks" in a certain territory. [Second Agreement § 1.1.] It similarly limited the licensed "Artwork," to LFI's "existing artwork"; any new or additional artwork was subject to an additional fee and agreed upon delivery schedule. [*Id.* §§ 3.1, 3.2.]

22. In exchange for this limited, non-exclusive license (and like the First Agreement), Plaintiff agreed to pay LFI a royalty of 15% of net sales of Licensed Products, accruing at the time of sale. [*Id.* § 6.2.] The Second Agreement also required Plaintiff pay a guaranteed minimum royalty of $500,000, including a nonrefundable advance of $125,000 (increased from the First agreement), plus three more quarterly payments towards the guaranteed minimum royalty, due "on or before" March 25, 2018, June 24, 2018, and September 29, 2018. [*Id.*] Plaintiff agreed to pay an additional 20% royalty on sales by Plaintiff directly to retail customers. [*Id.* §§ 6.1, 6.2(d).]

23. Similar to the First Agreement, Plaintiff agreed to "use its best efforts to make

3

and maintain timely and adequate arrangements to, and actively manufacture, distribute, promote, market and sell the Licensed Products, and . . . procure the greatest volume of sales of the Licensed Products throughout the Territory consistent with high quality." [*Id.* § 4.1.]

24. And just like with the First Agreement, Plaintiff's licensing rights were at all times conditioned upon LFI's express approval. [*See id.* §§ 8.1, 8.3, 8.4.]

25. New to the Second Agreement was the removal of the Pre-Shipment Samples approval process previously contained in the First Agreement. [*Compare* First Agreement § 8.2(a) with Second Agreement § 8.3(a).] Instead, Plaintiff agreed to pay LFI liquidated damages if any one of 15 different production issues occurred. [Second Agreement § 8.2.]

26. Additionally, and like the First Agreement, the Second Agreement provided LFI the right to terminate under several circumstances, including Plaintiff's failure to adhere to the approval process (Section 8.3[2]) or use its best efforts to exploit the license provided (Section 4.1). [*Id.* § 10.] The Second Agreement also granted LFI the right to terminate after a third occurrence of production issues. [*Id.* § 10.]

27. On July 25, 2018, LFI terminated the Second Agreement. [*See* Letter of Termination (Doc. 36-3); *see also* Second Agreement § 10 (providing reasons to terminate).]

IV.   **PLAINTIFF'S CLAIMS REMAIN UNSUPPORTED BY THE EVIDENCE.**

28. On May 27, 2021, Plaintiff filed suit against LFI and Lisa Frank, in her individual capacity. [Doc. 1; *see also* Plf.'s Amended Complaint (Doc. 28).]

29. On July 15, 2021, LFI responded by moving to dismiss the Complaint in its entirety. [*See* Defs.' MTD (Doc. 12).][3]

30. On December 18, 2021, Plaintiff amended its Complaint. [Doc. 28.]

31. Plaintiff claimed Defendants breached the First and Second Agreement, each on six grounds. [Doc. 28 ¶ 78(a–f).]

32. On January 5, 2022, Defendants moved to dismiss Plaintiff's Amended

---

[2] Section 10 erroneously refers to Section 8.2, an apparent holdover from the First Agreement.
[3] Ms. Frank was not yet served when the motion to dismiss was filed. She agreed to waive service on August 16, 2021. [Doc. 16.]

4

Complaint. [*See* Defs.' MTD (Doc. 31).]

33. While the motion to dismiss remained pending, LFI brought its own claims for breach of contract, and breach of the implied covenant of good faith and fair dealing, against Plaintiff. [Doc. 36.]

34. On August 4, 2022, the Court granted Defendants' Motion to Dismiss on three of the five breaches alleged by Plaintiff, and substantially limited two others, summarized below:

| Alleged Breach | Court's Ruling |
|---|---|
| "Completely failing" to provide artwork an eyeshadow palette, cosmetic bag, nail polish, brush roll, and eyeliners [Doc. 28 ¶ 78(a)] | Not dismissed [Doc. 41 at 26 ¶ 2] |
| Failing to timely review samples [Doc. 28 ¶ 78(b)] | Limited to June 2017 samples [*See* Doc. 41 at 8 ("Plaintiff does not allege Defendants failed to timely review any samples *other than June 2017 samples*; therefore, to the extent Plaintiff appears to be alleging Defendants violated [the Second Agreement], it has failed to allege fails supporting such a claim.") (emphasis added); Doc. 41 at 26 ¶ 2] |
| Failing to specify the reason for disapproving Plaintiff's samples [Doc. 28 ¶ 78(c)] | Limited to the June 2017 samples [*See* Doc. 41 at 9 ("Plaintiff does not allege Defendants failed to specify reasons for disapproval of any samples *other than June 2017 samples*; therefore, to the extent Plaintiff appears to be alleging Defendants violated [the Second Agreement], it has failed to allege fails supporting such a claim.") (emphasis added); *id.* at 26 ¶¶ 1, 2] |
| Refusing to accept samples for review [Doc. 28 ¶ 78(d)] | DISMISSED [Doc. 41 at 26 ¶ 1] |
| Seeking a more favorable license agreement with other companies before terminating the Second Agreement [Doc. 28 ¶ 78(e)] | DISMISSED [Doc. 41 at 26 ¶ 1] |
| Failing to provide written notice upon termination or an opportunity to cure any purported breach [Doc. 28 ¶ 78(f)] | DISMISSED [Doc. 41 at 26 ¶ 1] |

[*See* Aug. 4, 2022 Order (Doc. 41).]

A.     **Count One: Breach of Contract (Three Allegations)**

1.     **Alleged Breach #1: Failure to Provide Artwork**

35.    Among Plaintiff's surviving claims is Plaintiff's assertion that LFI failed to provide artwork for 14 products: (1) a "Cat Eyeliner"; (2) a "Matte Mousse"; (3–5) three pallets ("Wengie," "Bold and Bright," and "Naturally Glam"); (6) a "Unicorn Lippie"; (7) a lip-gloss or lip-balm tin; (8) a vegan cosmetic bag; (9) nail polish; (10) an agenda or notebook set; (11) a set of makeup brushes; (12) a pencil set; (13) a second makeup bag; and (14) a "Face Chart Coloring Book." [Plf.'s Resp. to ROG No. 6, attached as **Exhibit 3**; *see also* Doc. 28 ¶ 78(a).]

36.    Pre-litigation, on May 31, 2018, Plaintiff posted an update on its Kickstarter Campaign page.[4] [Project Update #62 (May 31, 2018), attached as **Exhibit 4** (LFI00001507–10).] The update linked to a "Production Matrix." [*See* S. Turtchin Decl., attached as **Exhibit 5**.] The linked Production Matrix noted Artwork as "COMPLETE" for products (1) – (8) with the exception of the "Wengie" palette:

| Product | Ingredients | Certified Vegan/Cruelty Free | Artwork | Status Notes |
|---|---|---|---|---|
| Travel Bronzer | YES | YES | COMPLETE | Manufacturing in progress, completion soon. |
| Single Eyeshadow | YES | YES | COMPLETE | Manufacturing in progress, completion soon. |
| Unicorn Lippie | YES | YES | COMPLETE | Custom mold finalized and painted and currently being reviewed by Lisa. Stable Box/Packaging has been reviewed and we are improving gloss coat on unicorn for maximum shine. |
| Decked Out Cosmetics Bag | YES | YES | COMPLETE | Final production sample has been reviewed. We are adjusting vegan leather fabric to have SHINE effect. |
| Eyeliner | YES | YES | COMPLETE | Rainbow gradient eyeliner with better color range is being manufactured for review. |
| Lip Balm Tin | YES | YES | COMPLETE | Lip Balm Tin samples are complete and up for review. |
| Highlighter | YES | YES | IN PROGRESS | We are in the process of manufacturing improved Highlighter tubes with shiny/metallic features and rainb bristles. |
| Matte Mousse | YES | YES | COMPLETE | Cap and logo colors have been chosen, sample production with chosen colors is underway. |
| Wengie Eyeshadow Palette | YES | YES | IN PROGRESS | Review is underway for artwork and color sample matching. |
| Bold & Bright Eyeshadow Palette | YES | YES | COMPLETE | Improvements to artwork and text for better visibility have been made and new samples are being made. |
| Natually Glam Eyeshadow Palette | YES | YES | COMPLETE | Improvements to artwork and text for better visibility have been made and new samples are being made. |
| Markie's Magical 3 Piece Manicure Set | YES | TESTING IN PROGRESS | IN PROGRESS | Sample Unicorn Horn caps have been painted. New color formulations are complete and look stunning. Packaging design is complete and being manufactured. Artwork placement to follow. |

37.    On June 5, 2018, Plaintiff sent LFI a PowerPoint Presentation summarizing the then-current production notes on various products. [Plf.'s June 5, 2018 PowerPoint Presentation, attached as **Exhibit 6**.] Plaintiff's PowerPoint Presentation shows that, as of this date, LFI had, by Plaintiff's own account, created artwork for products (1) – (8). [*Id.* at 4–7, 9–12 (showing mock-ups of products (1) –(8), all with LFI artwork and noting limited "Action

---

[4] LFI did not have access to the Kickstarter page to post updates and was not involved in posting these updates. [Ex. 9 at 224:09–227:05.]

Items" for LFI under each, none of which require artwork by LFI).] This included the "Wengie" palette. [*Id.* at 11; *see also* Plf.'s 30(b)(6) Dep. (Aug. 23 and 24, 2023), attached as **Exhibit 7**, at 371:19–372:15 ("Q. [But] if there was a photo of LFI artwork, that was artwork that had been provided by LFI? A Yes.").]

38. The parties never agreed upon the necessary delivery schedule for product (9)—the nail polish—as Plaintiff never submitted the necessary "dielines"[5] or product outlines necessary to allow for LFI to create artwork. [Ex. 6; LFI Art Chart, attached as **Exhibit 8**, at 8 ("LFI has not been able to complete the artwork because GD has not provided dielines for this product or completed the mold."); *see also* LFI'S 30(b)(6) Dep. (Oct. 18, 2023), attached as **Exhibit 9**, at 25:12–27:22 (confirming summary of Exhibit 9); *id.* at 77:15–25 ("As of 6-4, 2018 we weren't holding anything up because the [nail polish] cap [was] only in mockup mode."); Ex. 1 ¶¶ 6–8.]

39. Plaintiff never paid an additional fee, nor did the parties agree to a delivery schedule for the artwork associated with products (10) – (14), as these products were part of a "potential" collection with Indiegogo (not to launch until Plaintiff fulfilled its orders for its Kickstarter Campaign collection). [Ex. 7 at 49:23–24 ("Q. What about Indiegogo? A. That campaign never got realized."); Email from M. Kibildis to J. Ross (May 21, 2018), attached as **Exhibit 10**, at LFI0001417, 1421, 1425, and 1425–27 (listing products (10) – (14) as part of Plaintiff's "potential" collection with Indiegogo); Email from P. Georgotas to S. McPhillips (Jan. 17, 2018), attached as **Exhibit 11** ("[We're] putting together a clear concise list of the remaining Kickstarter products. Once those are tied off we'll start on the Indiegogo and 2018 collection in a clean and organized fashion.").]

### 2. Alleged Breach #2: Failure to Timely Review

40. Plaintiff's second breach of contract claim asserts Defendants failed to timely

---

[5] A dieline is an integral part of the design process—it is essentially the outline of where the printed piece will actually be cut. It helps with alignment and spacing to ensure symmetry and the appropriate layout for the artwork. [Ex. 1 ¶ 8.] In short, it is a critical template needed to ensure the correct layout of the final physical product. Without a dieline, print ready artwork cannot be produced accurately. [*Id.*]

7

review for "one shade of the Travel Bronzer," and "two shades of the Single Eyeshadow," submitted in June 2017, despite receiving "countless written notices" to trigger LFI's obligation. [Doc. 28 ¶¶ 32, 78(b); Ex. 3, Plf.'s Resp. to ROG No. 7.]

41. LFI reviewed Preproduction samples of the Travel Bronzer and two shades of single eyeshadow on June 16, 2017. [*See* Email from L. Crawford to P. Georgotas (June 16, 2017), attached as **Exhibit 12** (noting LFI had uploaded the sticker artwork for the bronzer and eyeshadows); Ex. 7 at 625:12–626:1 (confirming Plaintiff did not request any changes to that sticker artwork); *see also* Ex. 8 at 3 and 4 (showing LFI reviewed, and corrected numerous issues on bronzer and single eyeshadow preproduction throughout June 2017); *id.* at 9 (noting the "Kickstarter" bronzer and eyeshadows were identical to those listed under the "Ipsy" products, on previous pages); Email from P. Georgotas to L. Crawford (June 6, 2017), attached as **Exhibit 13**, at LFI0002188 (noting Plaintiff "X'd anything that was finished" and placing an "X" in columns of accompanying spreadsheet for "FIRST SAMPLE APPROVAL" AND "PRE-PRODUCTION APPROVAL" for the Travel Bronzer and the four Single Eyeshadows, among other products).] Indeed, throughout the month of June 2017, LFI was in regular contact with Plaintiff about these products. [*See, e.g.,* Email from P. Georgotas to L. Frank (June 9, 2017), attached as **Exhibit 14** (noting Plaintiff will need to "resticker" bronzers with approved sticker); Email from P. Georgotas to L. Crawford (June 14, 2017), attached as **Exhibit 1**5 (discussing eyeshadow and bronzer shades); Email from L. Crawford to P. Georgotas (June 15, 2017), attached as **Exhibit 16** (transmitting packaging notes for bronzer and eyeshadow); Ex. 12 (informing Plaintiff the sticker artwork for the eyeshadows and bronzer are uploaded); Email from L. Crawford to P. Georgotas (June 23, 2017), attached as **Exhibit 17** (approving Plaintiff's change to side labels); Email from L. Crawford to P. Georgotas (June 29, 2017), attached as **Exhibit 18** (discussing name of bronzer); Kickstarter post by Plaintiff (June 29, 2017), attached as **Exhibit 19**, at LFI0006127 (acknowledging reworking of bronzer and eyeshadow but noting "this won't affect your delivery schedule at all"); Texts between L. Crawford and P. Georgotas, attached as **Exhibit 20**, at GDI029203–29225; Ex. 1 ¶ 11 (confirming the products listed in ROG No. 7 are those reviewed by LFI on June 16, 2017)].

42. Despite claiming they sent "countless written notices to LFI, Plaintiff conceded Peter Georgotas never sent notice to LFI in accordance with the Agreements, and that, it was not aware of anyone else sending one either. [Ex. 7 at 72:2–7, 77:4–21.]

### 3. Alleged Breach #3: Failure to Justify Disapproval

43. Plaintiff's third and final breach of contract claim asserts Defendants "failed to be specific as to the reason for disapproval of samples submitted," in June 2017, per the First Agreement. [Doc. 28 ¶ 78(c).]

44. The samples at issue were received by LFI on June 7, 2017. [Ex. 14 at LFI0003865; *see also* Ex. 3, Plf.'s Resp. to ROG No. 7; Ex. 8.] That same day, LFI emailed Plaintiff enumerating its reasons for not yet approving the samples—e.g., the sticker on the bottom of the eyeshadow lacked the artwork supplied by LFI to Plaintiff and the bronzer was "too green." [*Id.; see also* Ex. 13 (noting "Initial Sample Sent to LF: "Pre-Pro[duction] Sample Sent to LF" and Pre-Pro[duction] Approval Received" for Travel Bronzer and four single eyeshadows).]

45. Two days later, LFI provided further feedback. [*See* Ex. 8 at 3 and 4 ("6/9/17: LFI catches that [Plaintiff] failed to include LFI copyright info when added its own and this needs to be corrected.").

46. During this whole process, LFI sought input from and collaborated with Plaintiff. [*See, e.g.,* Ex. 8; LFI's 30(b)(6) Dep. Notes, attached as **Exhibit 21**; Ex. 9 at 29:10–30:5 (explaining creation of Ex. 21) and Ex. 1 ¶¶ 9–11 (same); *see also* Exhibits noted in Statement of Fact 41.]

### B. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

47. Plaintiff claims Defendants breached the implied covenant by (a) entering into the Agreements "without an intent to fulfill" its obligations; (b) failing to provide artwork; (c) refusing to receive samples for review; (d) demanding an early royalty payment without intent to continue the Second Agreement; (e) acting with malice; and (f) stalling and delaying the production process. [Doc. 28 ¶ 83.] Plaintiff alleges the same type of harm as its fraud claim.

9

[*Compare id.* ¶ 84 with ¶ 89.]

48.     Plaintiff failed to produce any evidence to support Defendants' "intent," knowledge, or "malice" for (a), (d), (e), and (f). [Ex. 3, Plf.'s Resp. to ROG Nos. 12, 13, 15.] Indeed, Plaintiff admits it has no knowledge of what Defendants' intent was. [*See* Ex. 7 at 92:21–93:10 ("Q. I'm trying to figure out why [Plaintiff] thinks a company hungry for press a successful campaigns would want to enter an agreement . . . they were intending to have fail. . . . A. Again, I don't know what their intent was[.]").]

49.     On April 25, 2018, LFI wrote Plaintiff to inquire into the status of the overdue quarterly installment on the GMR, due on or before March 25, 2018. [Email S. McPhillips to P. Georgotas (April 25, 2018) attached as **Exhibit 22**, at LFI000880.]

50.     After Plaintiff expressed confusion over the due date, LFI sent a highlighted version of the Second Agreement and expressly noted that the GMR payments were due "on or before" the dates listed in the Second Agreement—not after the quarter closed, as claimed by Plaintiff. [*Id.* at LFI000879.] Plaintiff thanks LFI for the clarification and promised to "make sure it's done correctly going forward." [*Id.*] Yet as of May 2, 2018, Plaintiff's GMR payment was still past due. [*Id.*]

51.     This was not the first time LFI had emailed Plaintiff of its upcoming payment dates. [*See, e.g.*, Email from M. Diaz to P. Georgotas (July 11, 2017), attached as **Exhibit 23**, at LFI0003740–41.]

52.     Accordingly, on June 15, 2018, LFI sent an email reminding Plaintiff to pay its Second GMR Payment. [Email from J. Ross to P. Georgotas (June 15, 2018), attached as **Exhibit 24**, at LFI001366.] This email does not contain any "demand" that Plaintiff immediately pay—only a "reminder" that the payment was due "no later than 6/22" (as 6/24/2018 was a Sunday) to avoid any interest for late payment. [*Id.*] Plaintiff admits it did not pay any GMR payment early. [*Id.* at LFI0001545; Ex. 3, Plf.'s Resp. to ROG No. 15 ("The last wire for the [royalty payment] was received on June 28 by LFI, and on June 29, [LFI] contacted [Plaintiff] to set up a call for the following week. That call consisted of [LFI] terminating the Agreement with [Plaintiff]."); *compare to* Second Agreement Section 6(a–b)

("The scheduled payment of the balance of the GMR are due on or before the dates listed below. . . . Quarter 2 (ends 6/24/2018)"; *see* Ex. 27.]

### C. Count Three: Fraud

53. Plaintiff pleaded that Defendants made two false and material representations: (a) Janice Ross's (the Vice President of LFI) statement that the Kickstarter products would be produced and distributed by June 2018; (b) Defendants' "demand" that Plaintiff make an early royalty payment, which, upon receipt Defendants would comply with their contractual obligations to provide artwork, accept samples for review, and resume communications with Plaintiff. [Doc. 28 ¶ 86(a), (b).]

54. When asked in discovery to identify all false and material representations, made by Defendants, Plaintiff stated only that Ms. Frank and Ms. Ross, who joined LFI as a Vice President in May 2018, falsely assured Plaintiff "they would get LFI up to speed and organized in order to make sure product development would meet the deadlines."[6] [Ex. 3, Plf.'s Resp. to ROG No. 16.]

55. At its deposition, Plaintiff (and its designee, Peter Georgotas) stated that the representation identified in discovery occurred "before and during [Plaintiff's] meeting with Janice in Los Angeles." [*See* Ex. 7 at 682:18–684:6.] This meeting occurred on May 14, 2018, in Los Angeles [*See* Texts between J. Ross and P. Georgotas, attached as **Exhibit 25**, at GDI029198.]

56. Plaintiff testified that Ms. Frank made her comments, as referenced in ROG No. 16, "in the months before" Plaintiff met with Ms. Ross, although it was an "ongoing promise" that she would work to meet product deadlines. [Ex. 7 at 683:23–684:13, 685:15–22.]

57. Plaintiff could not provide any additional details as to what Ms. Ross or Ms.

---

[6] For purposes of this summary judgment motion only, Defendants do not dispute this statement because even if true, it is not actionable. To the extent this claim is not resolved on summary judgment, Defendants are prepared to present evidence that clearly shows the party in need of getting "up to speed and organized in order to make sure product development would meet the deadlines" was Plaintiff. That being said, for purposes of summary judgment, the Court need not decide this issue.

Frank represented, or *when* those representations were made.[7] [*Id.* 678:9–23 ("We were continually promised things from the time that we met Janice that we were never received or responded to."); *id.* 699:3–700:17 ("Q. Well, you told me there was more you would add to the response to [ROG] No. 16; right? A: I said that the things in [ROG] No. 16 are some, but not all of the things, yes. Q. So what's the rest? . . . A. So as I said, the rest of it are some phone conversations. But to be very accurate, I would have to go and, again, review this time period."); *see also* 30(b)(6) Deposition Notice to Plaintiff, attached as **Exhibit 26**, Topic 19.]

58. Although Plaintiff admits it does not know what Defendants intended, Plaintiff asserts Defendants made the representation (identified in discovery), knowing it was false, because "Defendants' actions did not match up with what they told [Plaintiff]." [Ex. 3, Plf.'s Resp. to ROG No. 17; Ex. 7 at 686:12–23 ("I sincerely thought that [Ms. Frank] wanted to finish these products . . . . We remained hopeful, but started to feel like perhaps that wasn't what the full intent was."); *id.* at 92:21–93:10 ("Again, I don't know what their intent was[.]"); *id.* 102:02–09 ("I don't think LFI ever put in writing: We don't intend to fulfill this.").] Plaintiff also stresses that LFI terminated the Second Agreement approximately six weeks after the meeting with Ms. Ross and Ms. Frank. [*See* Ex. 3, Plf.'s Resp. to ROG No. 15.][8]

59. Plaintiff claims it relied on Defendants' statement by "continu[ing] to focus on development of LFI products"; "finance[ing] purchase orders received"; paying to expedite sample production; developing additional products for LFI; paying warehouse and logistics fees for LFI products; continuing promotional activities; and taking out loans to cover the "business promises conveyed by LFI." [Ex. 3, Plf.'s Resp. to ROG No. 18.]

60. There is no evidence that Plaintiff financed any purchase orders between May 14, 2018 and July 3, 2018, although this was Plaintiff's standard practice from the start of

---

[7] Notably, Plaintiff did not file its complaint until May 27, 2021. [Doc. 1.] Accordingly, allegations of fraud prior to March 27, 2018, are necessarily time-barred. *See* A.R.S. § 12-543.
[8] For purposes of this summary judgment motion only, Defendants do not dispute these allegations because even if true, Plaintiff fails to meet its burden of proof on all elements of its claim. To the extent this claim is not resolved on summary judgment, Defendants are prepared to present evidence that clearly shows Defendants were prepared to do what was necessary for Plaintiff to deliver on its obligations to customers who backed Plaintiff's Kickstarter campaign but Plaintiff was unwilling to perform.

Plaintiff's business, long before entering the Agreements with LFI and irrespective of any alleged promises by Defendants. [*See* Ex. 26, Topic 20; *see also* Ex. 7 at 43:18–45:18 (noting Plaintiff used financing for its very first purchase order in 2013/2014 and that this is common in Plaintiff's industry); *id.* at 708:1–16 (noting only that Plaintiff borrowed $20,000 various friends to "continue operating . . . for prospective orders or future business of LFI products[.]").] In fact, there is no evidence that Plaintiff ever had any perchase orders issued in this period. [Ex. 1 ¶ 13.] There is also no evidence Plaintiff paid to expedite sample production during the May to July 2018 time. Nor is there evidence of any warehouse or logistics fees paid for LFI products, promotional activities undertaken, or loans obtained by Plaintiff during this same period. [*See, e.g.*, Ex. 7 at 711:3–8 ("Q. Do you know how much money was paid for that? Has it been disclosed? A. No. We would have to get that."); Ex. 1 ¶ 13; Ex. 27.]

### D. **Count Four: Unjust Enrichment**

61. Plaintiff pleaded unjust enrichment as an alternative to its breach of contract theories. [Doc. 28 ¶ 91.]

62. Plaintiff never identified whether Lisa Frank, in her individual capacity, retained any benefit from the First and Second Agreement, other than its assertion that she and LFI received the amount owed to LFI under the respective contracts. [*Id*. ¶ 9.]

63. And its assertion that Ms. Frank obtained the sums Plaintiff paid LFI under the First and Second Agreement was never substantiated as all of the payments were deposited by Plaintiff into LFI's account. [*See* LFI's Payment Chart, attached as **Exhibit 27**; Ex. 1 ¶ 12.]

### E. **Count Five: Defamation**

64. In November 2020, Insider Inc. ("**Insider**") published an article regarding LFI's collaboration with Morphe Cosmetics ("**Article**"). [Doc. 12-3.[9]]

65. The Article states:

---

[9] Although Plaintiff produced the Article as published in April 2021, the Article was originally published in November 2020. [Doc. ¶ 68.] Plaintiff never produced the November 2020 version of the Article.

13

> In an email to Insider, a representative for Lisa Frank Inc. said it "entered into a business arrangement" with Glamour Dolls "several years ago." "Unfortunately, Glamour Dolls completely failed to live up to our agreement, which includes their obligations within the Kickstarter campaign, failing to manufacture and deliver the products that our fans rightfully deserved," the representative said. "The Lisa Frank Company knows how you feel, as we did not receive what Glamour Dolls promised us either. After many months of pushing Glamour Dolls to live up to its contractual obligations and deliver products – to our fans and retailers that ordered products – Lisa Frank Inc. reached the point of exasperation, terminated the agreement with Glamour Dolls, and contacted the Federal Government," the statement continued. "To say we are disappointed by the events that transpired as a result of this license is an understatement." The Lisa Frank Inc. representative said the company was "excited about the upcoming collection" with its "trusted partners at Morphe" and that it knew Lisa Frank fans would "love these quality cosmetics that bring the joy of Lisa Frank to life."

[Doc. 12-3 at 8–9.] A full and complete copy of LFI's statement to Insider is attached as Exhibit 21 at 14.

66. Plaintiff's defamation claim is based on LFI's publication of this statement (Ex. 21 at 14) to Insider. [Doc. 28 ¶¶ 68–69, 98–104; Ex. 3, Plf.'s Resp. to ROG No. 4 (identifying the false statements pleaded in Doc. 28 ¶¶ 98, 104, and 114 as the "disparaging comments against [Plaintiff] to a media outlet, Insider. Inc.").] Plaintiff never produced evidence that Defendants knew the above statements were false and said them anyway or failed to investigate the truth of its statements prior to publishing its statement to Insider.

67. Plaintiff did not manufacture and deliver every order, paid for by fans through the Kickstarter Campaign. [*See, e.g.,* Email from R. Appel to D. Evered (Oct. 4, 2019), attached as **Exhibit 28** at LFI001097–1101 (showing thousands of products "Owed to Backers").]

68. Plaintiff also failed to deliver every product promised to retailers who had previously ordered Licensed Products from Plaintiff. [*See, e.g.,* A. Bardisbanian Decl. (Sept. 5, 2023) (LFI0007150–54), attached as **Exhibit 29**, at ¶¶ 16, 27–28.]

69. On or around November 2017, Plaintiff shipped the "Heartthrob" eyeshadow to customers without first sending LFI the contractually required Pre-Shipment or Manufactured Samples. [*See* Email from P. Georgotas to S. McPhillips (Nov. 17, 2017), attached as **Exhibit 30**; *see also* First Agreement *Id.* § 8.2(a).] The packaging contained a material typo. [*Id.*] Plaintiff also sent incorrect product packaging to multiple retailers. [*See* Email from P.

Georgotas to S. McPhillips (Nov. 28, 2017), attached as **Exhibit 31**, (LFI0004844) (admitting Plaintiff sold incorrect makeup packaging to Ipsy and Hot Topic).] This is not the only production issues LFI faced with Plaintiff. [*See, e.g.*, Email from S. McPhillips to J. Ross (April 28, 2018), attached as **Exhibit 32**, (LFI005406, 5408, 5409).]

70. Plaintiff never made its final Quarterly Royalty Payment, guaranteed as the "Minimum Royalty" under the Second Agreement, due upon termination on July 3, 2018, for $125,000, nor any of the accrued interest. [Letter of Termination (Doc. 36-3); Second Agreement § 6.2; Ex. 3, Plf.'s Resp. to ROG No. 19 ("[Plaintiff] paid all artwork invoices, made all quarterly royalty payments for products sold, and paid all advances *up to termination of the Agreement by LFI*.") (emphasis added); *see also* Second Agreement § 5.2(i) ("If this Agreement ends or is terminated for any reason before the Term expires, all monies owed by Licensee to LFI, including any unpaid Royalty under Section 6, shall become immediately due and payable. If the sum due is not paid within four (4) business days . . . Licensee shall pay interest thereon at a rate of 18% per annum[.]").] Plaintiff also never provided LFI any 2018 royalty reports. [Ex. 1 ¶ 13.]

71. For several months, LFI pushed Plaintiff to live up to its contractual obligations. This included reminding Plaintiff to pay its royalty payments and working with Plaintiff—via email, phone, and in-person meetings—to secure complete approval of all Licensed Products. [*See, e.g.*, Email from J. Ross to P. Georgotas (June 4, 2018), attached as **Exhibit 33** (providing agenda for upcoming conference call along with an updated products approval chart).]

72. LFI contacted the federal government to report Plaintiff's non-performance and misuse of the Kickstarter funding. [Ex. 9 at 233:3–235:8 (describing LFI's discussion with the FBI, regarding Kickstarter funders); *see also* Ex. 7 at 424:15–425:4 (admitting FBI contacted Plaintiff's attorney).]

F. **Count Six and Seven: False Advertising and Trade Libel**

73. Plaintiff's false advertising and trade libel claims are based on the Article, i.e., LFI's statements to Insider in November 2020. [Doc. 28 ¶¶ 106–112, 114–119.]

74. On December 3, 2020, Plaintiff's owner and sole employee—Peter

15

Georgotas—declared bankruptcy. [*See, e.g.*, Voluntary Petition for Individuals Filing for Bankruptcy, Official Form 101 (Dec. 3, 2020), attached as **Exhibit 34**; Ex. 7 at 78:20–24] In his bankruptcy petition, which Mr. Georgotas swore under penalty of perjury he had read and was true and correct, Mr. Georgotas identified that he owed 75% of Glamour Dolls, Inc., valued at $1.00. [*Id*. at 11, 12.] Nowhere in his petition did Mr. Georgotas identify *any* claim either Plaintiff or he had against LFI or Ms. Frank. [*See generally id.*]

75. On February 7, 2023, Mr. Georgotas submitted an updated summary of his assets and liabilities in his bankruptcy proceeding. [Official Form 106Sum (Feb. 7, 2023), attached as **Exhibit 35**.] This form was again signed by Mr. Georgotas under penalty of perjury, with him declaring he had read the summary and schedules filed with his declaration and they were "true and correct." [*Id*. at 12.] In this filing, Mr. Georgotas affirms his 75% ownership in Plaintiff and its value of only $1.00. [*Id*. at 5.]

76. Plaintiff testified that by the end of 2018 Plaintiff was "close to inoperable." [Ex. 7 at 325:10–13.] Plaintiff also testified that by the end of 2018, it could only fulfill orders for which it already possessed the inventory, as it "couldn't even manufacture" its own products. [Ex. 7 at 86:07–23, 181:16–182:12.]

G. **Count Eight: Tortious Interference with Business Expectancies**

77. Plaintiff alleges Defendants published the Article with the knowledge that such statements would be disseminated to the public at large, and that as a result, "third parties with which [it] had previously dealt and/or which had expressed interest in collaborating with [it] prior to the article's publication, including, but not limited to, MGD Solutions, Inc., Kickfurther and H-E-B Grocery Company, LP , abruptly backed out and refused to speak or even communicate with [it]." [Doc. 28 ¶¶ 122, 125.]

78. Plaintiff, however, lists no potential witnesses from *any* of these companies in its Rule 26(a)(1) disclosures. [Plf.'s Rule 26(a) Disclosure, attached as **Exhibit 36**, at 3–6.]

79. Plaintiff testified its relationship with MGD Solutions, Inc. "naturally ended" and "left things on a positive note." [Ex. 7 at 355:19–356:4, 356:17–21.]

80. There is no evidence Plaintiff intended to or had executed an agreement with

16

Kickfurther in the relevant time period; in fact, Plaintiff admitted its relationship with Kickfurther ended in late 2018 because it owed Kickfurther money, not because of the Article. [Ex. 7 at 357:19–25.]

81. Plaintiff testified that sometime in the Summer of 2020, a representative of H-E-B contacted it via a platform where Plaintiff had its products listed, asking about carrying Plaintiff's products. [Ex. 7 at 360:5–361:01, 367:22–25.] Plaintiff allegedly sent H-E-B samples, although Plaintiff admitted that at that point it did not have the ability to work with H-E-B. [*Id*. at 360:5–20; 361:14–19; *id*. at 368:5–18.] Plaintiff never produced the representative's message, nor proof that it sent the samples. [*Id.*] Plaintiff could not provide details on the potential business expectancy posed by the message and admitted H-E-B never issued a purchase order and that they only had "just a couple" interactions. [*Id*. at 368:8–11; *id*. at 369:1–12.] Plaintiff confirmed in no longer had the capacity to manufacture any goods, as of this this time. [*Id*. at 360:18–20.]

82. As of November 2020, Plaintiff lacked knowledge of any business expectancy, held by Plaintiff, with any entity, including MGD Solutions, Inc., Kickfurther and H-E-B Grocery Company, LP. [Ex. 1 ¶ 14.]

**H.** **Count Nine: Ms. Frank's Personal Liability**

83. Plaintiff alleges that Ms. Frank operated LFI in a way to "justify" piercing the corporate veil. [Doc. 28 ¶ 129.]

84. In support of this claim, Plaintiff pleaded upon information and belief that Ms. Frank is the sole owner/shareholder, founder, president and CEO of LFI. [*Id*. ¶¶ 130(a) and (b).]

85. Ms. Frank testified her son Forrest Green is also a shareholder, and is also the treasurer and secretary of LFI. [Ex. 9 at 181:23–25; 183:05–183:11; *see also* Ex. 1 ¶¶ 2–3.]

86. Plaintiff claims upon information and belief that Ms. Frank controls LFI's assets and operations to the point that separate practical day-to-day identities of each ceases to exist and the activities of each cannot be meaningfully distinguished from the activities of others. [Doc. 28 ¶ 130(c).] Plaintiff, however, pleaded no facts in support of this contention. [*Id*.

17

¶¶ 128–133.]

87. LFI has between about six full time employees, and four part-time employees. [Ex. 9 at 181:6–16.] When asked at her deposition if any of her decisions at LFI have been overruled by anyone over the past five years, Ms. Frank testified she gets overruled "all the time." [Ex. 9 at 187:5–8.]

88. Plaintiff claims Ms. Frank commingled personal and corporate funds, alleging all royalty payments tendered by Plaintiff under the two agreements were deposited directly into Ms. Frank's personal trust account. [Doc. 28 ¶ 130(d); Ex. 3, Plf.'s Resp. to ROG No. 2.]

89. LFI instructed Plaintiff to deposit all payments via wire transfer to the "Lisa Frank, Inc. Account." [*See* Email from R. Rubino to P. Georgotas (June 7, 2016) (LFI0005060–64), attached as **Exhibit 37** (requesting wire "Lisa Frank, Inc. Account").] This is the only account in which Plaintiff ever deposited funds. [*Id*.; Ex. 27; Ex. 9 at 30:13–19, 31:7–32:2; Ex. 1 ¶ 12.]

DATED this 10th day of November 2023.

> GREENBERG TRAURIG, LLP
>
> By: */s/ Laura Sixkiller*
>     Laura Sixkiller
>     Shalayne L. Pillar
>     *Attorneys for Defendant/Counterclaimant*
>     *Lisa Frank, Inc. and Lisa Frank*